In re MARTIN.

GOODWIN et al. v. HEADLEY.

(Circuit Court of Appeals, Third Circuit. December 2, 1912.)

No. 1,656.

BANKRUPTCY (§ 163*)—PREFERENCES—NATURE OF TRANSACTION—TRANSFER.

A bankrupt, having a foreign newspaper route or agency, the termination of which, however, was entirely within the option of the publishers, having become indebted to them, and being compelled to settle the indebtedness in order to retain the route, procured a loan from defendants, making an assignment of his agency right to them as security for the money advanced; they agreeing to sell the agency back to him whenever he should repay the advancements. Defendants continued to permit the bankrupt to manage the agency, but he again fell into debt to the publishers, who notified him that unless the accounts were settled he would receive no more papers after the succeeding day. The bankrupt being unable to pay, defendants were compelled to do so in order to save the agency, which they did, and subsequently sold the agency to others against the bankrupt's protest, and for the amount obtained, less the sum advanced to the bankrupt, the trustee sought to hold them liable. *Held*, that the agency was a mere revocable privilege, and that the transaction did not amount to a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 163.*]

Appeal from the District Court of the United States for the District of New Jersey; Joseph Cross, Judge.

Action by James R. Headley, trustee of John N. Martin, bankrupt, against Eugene B. Goodwin and another. Judgment for plaintiff, and defendants appeal. Reversed.

William T. Boyle, of Camden, N. J., for appellants.

Martin W. Lane and Louis H. Miller, both of Millville, N. J., for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This is a suit in equity, brought by a trustee in bankruptcy to recover a sum of money from the defendants. He averred that they had come into possession of certain property belonging to the bankrupt by a transaction that amounted to a preference, and had afterwards sold it at a profit. As nothing except a money decree was asked for, or obtained, we are unable to see why the remedy at law was not adequate; but as the defendants do not, and did not, make that objection, we shall pass it without further notice and decide the case on its merits.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The facts are these: John N. Martin was adjudged a voluntary bankrupt on January 11, 1909. He had been insolvent for several months, and the defendants were acquainted with his condition. Indeed, as long before as February 15, 1908, he was unable to pay his debts, especially a debt of $2,000, for on that day be borrowed from them the sum named and attempted to secure them in the following manner: He was then a so-called "agent" in Millville, N. J., for the sale and distribution of several Philadelphia newspapers, and the debt of $2,000 was due to the publishers. His arrangement with them had existed for several years. It was verbal and informal, but its terms appear with sufficient clearness. In reality, he was not an agent at all in the usual meaning of that word, but a wholesale buyer and a retail seller of newspapers. The publishers were no doubt willing to give him certain advantages in the market, but they did not agree to sell exclusively to him, although in practice they sold to no other person in Millville. As long as he paid his bills regularly it was likely that he would be the only person to receive their journals, but they were under no contract to that effect. They did not pay him for what he did. His profits came solely from selling at a higher price than he paid. His subscribers were under contract with him, and not with the publishers. Neither he nor the publishers were bound to continue the relation. He might give up the business of selling their wares at any moment without liability to them, and they were free to sell to any other person and to decline further dealings with him. Nevertheless, the arrangement would probably continue as long as he wished, but on the condition that he paid his bills and remained otherwise acceptable. He mght even sell the "agency" or the "route," and they might (and probably would) allow the purchaser to take his place on the same conditions; but in reality all he could call his own was a rather loosely defined privilege that was revocable at their pleasure, and, as already stated, they did not even agree that it should be exclusive. It was this intangible privilege, this business risk or expectation, wthout the sanction of a contract, that the bankrupt undertook to use as security in February, 1908. He went through the form of selling it to the defendants for $2,000 by a written bill of sale, and they went through the form of agreeing to sell it back to him whenever he should repay the money they had just advanced. He was to pay $100 a month, or more at his option, but he was to continue in possession of the "agency," and was to take all its income and profits as long as he should pay the monthly notes. If he failed to pay, the defendants reserved the right to remove him "from the possession of the said agency, and to conduct the same themselves." The publishers, whose debt was about to be paid, knew at least something of the transaction, and on February 17th they united in acknowledging "the receipt of notice of the transfer of the newspaper route of John N. Martin, of the city of Millville, New Jersey, unto" the defendants. But they expressly stipulated that their own rights should not be affected in any way thereby to their prejudice, and that they should remain free to protect their own interests in any way they should deem advisable, declaring that they were not to be deemed in any way the guarantors of the transaction.

The agreement between the bankrupt and the defendants was valid,

and under it there were no doubt reciprocal rights; but its subject-matter was of a peculiar and precarious nature. The publishers were not bound to sell their newspapers either to the bankrupt or to the defendants. They could sell to whomsoever they pleased, and of course they would not continue to furnish newspapers to the bankrupt unless he paid his bills. And this is just what he failed to do. He fell into arrears again, and on January 8, 1909, he owed the publishers $2,100 more. On that day they notified him that he would receive no more newspapers, unless the accounts were settled on the 9th; but they recognized that the defendants had some interest in the situation, and notified them also how matters stood. As the bankrupt could not pay, the defendants were practically driven to pay, and thereupon the publishers exercised their undoubted right to discontinue selling to the bankrupt. They sold to the defendants instead, and the business was carried on by the latter for a few months on their own account. The bankrupt did not consent to this arrangement. On the contrary, he opposed it as much as he could, and competed for custom as vigorously as possible; but the publishers controlled the situation, as they had a right to control it, in the defendants' favor. In a few months the latter sold their privilege to other persons, and for the amount thus obtained, less the $2,000 advanced to the bankrupt in February, 1908, the trustee sought to hold them liable. The court entered a decree for this balance, but not upon the theory put forward by the bill. As already stated, the bill avers a preferential transfer; but it is clear that no such transaction took place. The bankrupt did not transfer anything to the defendants, and took no part in what was done. He could, therefore, have had no intent to prefer, and the defendants could not be charged with knowledge of a nonexisting intent. If the privilege had been tangible property belonging to the bankrupt, and if the defendants had taken possession of it, the trustee might have recovered it, or its value, by an appropriate action at law; but there was no such property and no such suit. He was finally permitted to recover upon the theory that the bankrupt had given a mortgage, and that the mortgagees had taken possession against his will, and had sold at a profit for which they were obliged to account.

The irregularities of the proceeding are manifest, and the result cannot be sustained. The evidence does not support the bill, and the bill does not support the decree. And—what is of more importance, since we are striving to reach the merits—neither does the evidence support the decree. The defendants did not take possession of the bankrupt's property. They were not bound to pay his debt of $2,100 and carry on business for his benefit. He had no contract right to the business, and the defendants were at liberty to make a new arrangement with the publishers on their own account. There is no element of fraud or oppression in their conduct. So far as appears, they acted throughout in good faith and were only anxious to retrieve as much as possible of their advancements, all of which would otherwise have been lost. They deprived the bankrupt of nothing that he was capable of conveying against the will of the publishers. He had only a revocable privilege, and when the publishers revoked it, and allowed the defendants to take his place, he had no legal ground of complaint. Such, as-

sistance as may be found in the cases that are cited—Hathaway v. Bennett, 10 N. Y. 108, 61 Am. Dec. 739, and Senter v. Davis, 38 Cal. 450 —is opposed to the theory on which the decree is based.

The decree is reversed—the costs to be primarily charged against the bankrupt estate—and the District Court is directed to dismiss the bill.